574 So.2d 1342 (1990)
Marion Albert PRUETT
v.
STATE of Mississippi.
No. 89-CA-0814.
Supreme Court of Mississippi.
December 27, 1990.
Clive A. Stafford Smith, Stephen B. Bright, Palmer Singleton, Atlanta, Ga., for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
This appeal was argued on the same day as Wilson v. State, 574 So.2d 1324 (Miss. 1990), and 574 So.2d 1338 (Miss. 1990), and is controlled by our holding therein.
Mississippi Code Annotated § 99-15-17 (Supp. 1990), is not unconstitutional and this case is reversed and remanded for a proper hearing on expenses under the statute.
REVERSED AND REMANDED FOR A HEARING ON THE APPROPRIATE AMOUNT OF EXPENSES.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON and BLASS, JJ., concur.
ROBERTSON, J., concurs by separate written opinion.
ANDERSON, J., dissents.
PITTMAN, J., not participating.
ROBERTSON, Justice, concurring:
Our statutory cap on fees and expenses for court appointed counsel has been on the *1343 books for years, and I think it apparent to all who will see that the statute is unconstitutional and unenforceable as applied. I say this in the sense that, not only in capital cases, the statute in a major way inhibits the state's discharge of its Gideon[1]-based duty to provide each criminally accused effective assistance of counsel. I have no doubt of our authority and responsibility under the principles articulated in Hosford v. State, 525 So.2d 789 (Miss. 1988), to strike the statute and order reasonable compensation for court appointed counsel. If an adequate courthouse is essential to the administration of justice, so are competent counsel. I concur in the rationale articulated by Justice Anderson in his separate opinion insofar as it follows Hosford.
The Takings argument seems more problematical. For one thing, it is at odds with the dominant theme of federal takings jurisprudence. Lawyers like others must endure the petty larceny of the police power. Federal law suggests to my mind that there is no taking unless the lawyer is effectively put out of business, see First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), although concede the phrase "or damaged" in this state's Takings Clause makes the point more viable. I am also dubious of the Equal Protection argument.
If I appreciate correctly the practical effect of the majority's reading of the statutory phrase "actual expenses", it will effectively empower our circuit courts to order the public treasurer to deliver to court appointed counsel a sum somewhat in excess of $25.00 per hour. Whether this delivery be called a payment or a reimbursement is a matter of semantics without economic or constitutional significance. The majority effectively skins the cat, and, although I would prefer Justice Anderson's Hosford based approach, I concur in the majority's holding and rationale.
ANDERSON, Justice, dissenting:
Today the majority has determined that § 99-15-17 is neither unconstitutional nor unreasonable. The majority comes to this conclusion while erroneously relying on Young v. State, 255 So.2d 318 (Miss. 1971) and Board of Supervisors of George County v. Bailey, 236 So.2d 420 (Miss. 1970). Moreover, the majority refuses to respect this Court's obligation and authority as explained most recently in Hosford v. State, 525 So.2d 789 (Miss. 1988). What concerns me more, however, is that the majority comes to this bizarre conclusion when the parties, the appellants and the State, have virtually stipulated that the statute is unreasonable. Furthermore, trial judges in this state also have recognized that this statute has infringed upon their duty to appoint and adequately compensate counsel involved in capital litigation.
When counsel, such as those involved in these cases, have dedicated this extraordinary amount of time, effort, energy and expertise to the representation of those, who people believe deserve the least help because of the crimes they have allegedly committed, this Court must not hesitate to assure that counsel be compensated at a level that would not be confiscatory. Of course the Court must be concerned with the economics involved, but we can not fall short of our obligation to provide an indigent defense system that works.
With these thoughts, I present the following opinion which was prepared initially as the majority opinion. Because this opinion failed to maintain a majority, I submit it in its entirety as a dissent.
In this consolidated appeal with Wilson v. State, 574 So.2d 1338 (Miss. 1990), this Court has been called upon to address the constitutionality of Mississippi Code Annotated, Section 99-15-17 (Supp. 1990), which states:
The compensation for counsel for indigents as provided in Section 99-15-15, shall be approved and allowed by the appropriate judge and in any one (1) case *1344 may not exceed one thousand dollars ($1,000.00) for representation... . Provided, however, in a capital case two (2) attorneys may be appointed, and the compensation may not exceed two thousand dollars ($2,000.00) per case... . In addition, the judge shall allow reimbursement of actual expenses. The attorney or attorneys so appointed shall itemize the time spent in defending said indigents together with an itemized statement of expenses of such defense, and shall present same to the appropriate judge. The fees and expenses as allowed by the appropriate judge shall be paid by the county treasurer out of the general fund of the county in which the prosecution was commenced.[1]
In these two cases, the appellants have presented several arguments attacking the constitutionality of this statute. The State, on the other hand, has failed to rebut sufficiently any of these arguments presented in both cases. As a matter of fact, the State only presented a cursory response in its brief to this major subject. Moreover, in its brief and at oral argument, the State has conceded, confessed, and basically stipulated that the limitation provided in § 99-15-17 is unreasonable. In light of the appellants' arguments and the State's confession, we conclude that trial courts as provided in Hosford v. State, 525 So.2d 789 (Miss. 1988), have the right and the obligation to compensate counsel representing indigent defendants at the rate that we establish today.
On this day, we issue an in depth opinion because there are many concerns which impact adversely on our indigent defense system, and we are compelled to address these issues. Our system is crying for help, and this Court must step forward to provide the antidote for the cure or at least provide the necessary assistance to get temporary relief. In prescribing this relief, we note that the State, by stipulation, confession, and by failing to address adequately the issue in both of its opportunities, has consented to the reasonableness of our solution.[2]

I.

DEATH IS DIFFERENT
Before discussing the assignments, however, it is proper to emphasize the nature of capital cases in general.
The punishment given to defendants convicted of capital crimes is death, the only punishment that may involve the conscious infliction of physical pain. Furman v. Georgia, 408 U.S. 238, 288, 92 S.Ct. 2726, 2751, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring). Throughout the capital jurisprudence since Furman every Supreme Court justice has insisted or at least endorsed the notion that death is different. See, e.g. Spaziano v. Florida, 468 U.S. 447, 468, 104 S.Ct. 3154, 3166, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part) ("In the 12 years since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), every member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique standards... .") (footnote omitted); California v. Ramos, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 3451-52, 77 L.Ed.2d 1171 (1983) (majority opinion authored by O'Connor, J., and joined by Burger, C.J., and White, Powell, Rehnquist, JJ.,) ("Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.") Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (Stevens and Powell, JJ., concurring) ("Death as a punishment is unique in its severity and irrevocability.") *1345 Beck v. Alabama, 447 U.S. 625, 637-38, 100 S.Ct. 2382, 2389-90, 65 L.Ed.2d 392 (1980) (majority opinion authored by Stevens, J., and joined by Burger, C.J., and Brennan, Stewart, Blackmun and Powell, JJ.) ("As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments... .") Rummel v. Estelle, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980) (majority opinion authored by Rehnquist, J., and joined by Burger, C.J., and Stewart, White and Blackmun, JJ.) ("This theme, the unique nature of the death penalty for purposes of eighth amendment analysis, has been repeated time and time again in our opinions." (citations omitted)); Ake v. Oklahoma, 470 U.S. 68, 87, 105 S.Ct. 1087, 1098, 84 L.Ed.2d 53 (Burger, C.J., concurring) (In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases.); Saffle v. Parks, ___ U.S. ___, ___, 110 S.Ct. 1257, 1262, 108 L.Ed.2d 415, 427 (1990) (majority opinion authored by Kennedy, J., and joined by Rehnquist, C.J., White, O'Connor, and Scalia, JJ.) ("[l]ongstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary.") citing Woodson v. North Carolina 428 U.S. 280, 303-05, 96 S.Ct. 2978, 2990-92, 49 L.Ed.2d 944 (1976) (plurality opinion);[3]Murray v. Giarrantano, 492 U.S. 1, ___, 109 S.Ct. 2765, 2777, 106 L.Ed.2d 1, 19 (1989) (Stevens, J., dissenting and joined by Brennan, Marshall, Blackmun, JJ.) ("The unique nature of the death penalty ... necessitates additional protections during pretrial, guilt and sentencing phases, ..." (footnote omitted)); (emphasis added) Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 2721, 101 L.Ed.2d 702 (1988) (Scalia, J., dissenting) (referring to "death is different" theme as a "motto"); Clemons v. Mississippi, ___ U.S. ___, 110 S.Ct. 1441, 108 L.Ed.2d 725, 753 (1990) (Blackmun, Brennan, Marshall and Stevens, concurring and dissenting) (By now it is settled law that death is different and this difference calls for greater degree of reliability). See also, Bonnie, The Dignity of the Condemned, 74 Va.L.Rev. 1363, 1364-365.
This Court also has emphasized and reiterated the fact that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." Jackson v. State, 337 So.2d 1242, 1252 (Miss. 1976) (citation omitted); see also, Griffin v. State, 557 So.2d 542, 552 (Miss. 1990) (In capital murder cases this Court has applied a heightened standard of review) (emphasis added); Williamson v. State, 512 So.2d 868, 872 (Miss. 1987) ("What may be harmless error in a case with less at stake becomes reversible error when the penalty is death.") (quoting Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978); Smith v. State, 499 So.2d 750, 756 (Miss. 1986) ("where the death penalty has been imposed, thoroughness and intensity of review are heightened."); West v. State, 485 So.2d 681, 690 (Miss.), cert. denied, 479 U.S. 983, 107 S.Ct. 570, 93 L.Ed.2d 574 (1986) (Anderson, J., dissenting, joined by Walker and Roy Noble Lee, P.JJ.,) ("[i]n death penalty cases our responsibility is awesome and we will turn every stone to assure the accused a fair trial.") (emphasis added); Pinkton v. State, 481 So.2d 306, 308 (Miss. 1985) (Because of the terrible character of this penalty, we have long taken a different approach in reviewing capital cases.) (Emphasis added) Fisher v. State, 481 So.2d 203, 211 (Miss. 1985); Fuselier v. State, 468 So.2d 45, 50 (Miss. 1985); Jones v. State, 461 So.2d 686, 690 (Miss. 1984) ("This theme, the unique nature of the death penalty, has been repeated time and time again." [citations omitted]). Moffett v. State, 456 So.2d 714, 721 (Miss. 1984); Billiot v. State, 454 So.2d 445, 454 (Miss. 1984); Neal v. State, 451 So.2d 743, 750 (Miss), cert. denied 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); Williams v. State, 445 So.2d 798, 810 (Miss. 1984), cert. denied 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985); Laney v. State, 421 *1346 So.2d 1216, 1217 (Miss. 1982). See also, Augustine v. State, 201 Miss. 731, 29 So.2d 454, 454 (1947) ("we have searched the record in vain for some ground on which to reverse the conviction... [b]ecause we have felt it our duty to reverse the case if we could find grounds for so doing.").[4]

A.

WHAT DOES A LAWYER HAVE TO DO IN REPRESENTING AN ACCUSED?
Not only is the penalty different from all punishments imposed in this society, but the legal proceedings involved with capital litigation distinguish it from most other proceedings tried in our courts. Counsel must have particular skills for competent representation in a capital case because these cases involve "extraordinary circumstances and unusual representation." White v. Board of Commissioners, 537 So.2d 1376, 1380 (Fla. 1989) (quoting Makemson v. Martin County, 491 So.2d 1109, 1110 (Fla. 1986), cert. denied Martin County Florida v. Makemson, 479 U.S. 1043, 107 S.Ct. 908, 93 L.Ed.2d 857 (1987))[5] Criminal law itself is a "demanding, rapidly changing and complex specialty." Jewell v. Maynard, 383 S.E.2d 536, 542 (W. Va. 1989). But, capital cases "raise complex additional legal and factual issues beyond those raised in an ordinary felony trial." People v. Bigelow, 37 Cal.3d 731, 209 Cal. Rptr. 328, 691 P.2d 994 (1985). In fact, "death penalty litigation has become so highly specialized that few attorneys have `even a surface familiarity with seemingly innumerable refinements put on Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and progeny.'" Irving v. State, 441 So.2d 846, 856 (Miss. 1983), cert. denied 470 U.S. 1059, 105 S.Ct. 1774, 84 L.Ed.2d 834 (1985) (citation omitted).
Representation of the accused in a capital case involves a complex body of constitutional law and unusual procedures that do not apply in other criminal cases.[6] Probably one of the most distinctive factors of the proceeding is that a bifurcated trial is necessitated. During the guilt phase counsel must consider and strategically *1347 plan what type of defense he will present during the guilt phase. Inevitably whatever defense he uses during this phase will have some affect on the jury during the sentencing phase as well. For example, if his defense is one of denial, then if the jury still finds him guilty, it is likely that the jury will not look or listen too favorably to the evidence that the defendant produces during the sentencing phase. Therefore, "at a minimum, counsel has a duty to interview potential witnesses and make an independent investigation of the facts and circumstances of the case." State v. Tokman, 564 So.2d 1339, 1342 (Miss. 1990).
Whatever penalty is chosen by the jury in a capital case is often determined by defense counsel's ability to present a "motion picture" of his client's life to rebut the gruesome "snapshot" that the prosecution has projected during the guilt phase and reiterates during the sentencing phase. See, Sherrell, Successive Chances for Life: Kuhlmann v. Wilson, Federal Habeas Corpus and the Capital Petitioner, 64 N.Y.U.L.Rev. 455, 477 (1989). In presenting the motion picture of the now convicted defendant, counsel must also present whatever mitigating evidence he can find. This is so critical that the Supreme Court has consistently emphasized that a defendant can present any mitigating evidence that might persuade the sentencer to vote for a life sentence. See, Skipper v. South Carolina, 476 U.S. 1, 4-9, 106 S.Ct. 1669, 1670-74, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); Accord. Turner v. State, 573 So.2d 657, 674 (Miss. 1990); Leatherwood v. State, 473 So.2d 964, 970 (Miss. 1985). Jordan v. State, 518 So.2d 1186 (Miss. 1988).
The only way counsel can discover this mitigation evidence is through extensive pre-trial investigation. Counsel has
a duty to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses. There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation, and the thoroughness and care which it is conducted, cannot be overemphasized.
Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.J.U.L.Rev. 299, 323-24 (1983). See also, Tokman, 564 So.2d 1339.
Another commentator has noted:
[i]t is essential that the defense counsel interview as many of these individuals [i.e., doctors, ministers, co-workers, family members] as possible and question them about the extent of their knowledge of the defendant, specific encounters they can recall and their willingness to testify for the defendant during the penalty hearing. Each potential witness will need to understand the background of the case, the nature of the penalty proceedings, the importance of mitigating factors, and the relevancy of her testimony. Expert testimony may also be necessary to establish mitigating circumstances during the penalty phase.
Completing this type of preparation prior to the guilt phase of a capital trial would tax the time and resources of any practitioner ... Financial restrictions often compel attorneys to focus on the guilt phase initially with the hope that a good performance at that stage would obviate the need for a penalty phase. While it is essential that counsel maintain a consistent strategy throughout both phases of a capital trial, the qualitative difference in the evidence needed at either stage of the trial can make it difficult to complete preparation for both phases prior to the beginning of the guilt phase.
Abrams, A Capital Defendant's Right to a Continuance Between the Two Phases of a Death Penalty Trial, 64 N.Y.U.L.Rev. 579, 599-600 (1989) (footnotes omitted) (emphasis added).
After gathering this information counsel must then prepare to present this evidence *1348 to the jury to demonstrate that he has human qualities both good and bad. Consequently,
`Avoidance of the death penalty may rest largely on the jury's perception of the character and personal history of the defendant. Thus, an important aspect of the right to present mitigating evidence lies in the defense's ability to present the defendant to the jury in human terms.'
People v. Robbins, 45 Cal.3d 867, 892, 248 Cal. Rptr. 172, 187, 755 P.2d 355, 370 (1988), cert. denied Robbins v. California, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 981 (1989) (Musk, J., concurring) (quoting Sullivan, The Capital Defendant's Right to Make a Personal Plea for Mercy, 15 N.M. L.Rev. 41, 60 [1985]).
It is this type of extensive pretrial investigation that is deemed critical and crucial in capital cases. As one judge, speaking on the essential nature of investigation, declared:
The lawyer ... has a substantial and very important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant himself. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

Proffit v. Wainwright, 685 F.2d 1227, 1271 (11th Cir.1982) (Clark, J., concurring in part and dissenting in part); cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983) (emphasis in the original) quoting A.B.A. Project on Standard for Criminal Justice, Standard's Relating to: The Prosecution Function and the Defense Function 277 (1970).
We have emphasized the paramount importance of investigation because this must be done before any pre-trial motion is filed; before any brief in support of a pre-trial motion is drafted; before selection of the jury; and before the trial itself. Moreover, many of these same motions are renewed after the guilt phase of the trial. Careful investigation takes time because there are so many things that counsel must search and scrutinize critically.
Now we turn to the case sub judice to see what the attorneys for Marion Albert Pruett did in representing their client.

B.

WORK HABITS OF PRUETT'S COUNSEL
Pruett was represented by two attorneys: Stephen Bright and Palmer Singleton. Bright documented 449.5 hours work on Pruett's case, while Singleton documented 482.5 hours.[7] This is not Pruett's first time before this Court. This Court originally affirmed his conviction for capital murder and sentence of death. Pruett v. State, 431 So.2d 1101 (Miss. 1983), cert. denied 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). This Court denied him leave to file a petition for writ of error coram nobis. Pruett v. Thigpen, 444 So.2d 819 (Miss. 1984). After extensive appeals the Federal District Court for the Southern District of Mississippi subsequently granted habeas corpus relief. Pruett v. Thigpen, 665 F. Supp. 1254 (S.D.Miss. 1986), aff'd, 805 F.2d 1032 (5th Cir.), cert. denied, 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987).
Mississippi was not the only state that had an interest in Pruett's prosecution for various crimes. He faced a pending death sentence in Arkansas, two capital murder convictions in Colorado, another murder conviction in Mexico, and a plethora of other priors from all across the country. As was their obligation, Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), Pruett's counsel investigated *1349 each with a view to excluding them from the retrial.
Prior to the retrial of the case, appointed counsel also undertook substantial appellate litigation on Pruett's behalf. Among this litigation included two interlocutory appeals accepted by this Court. In one of these appeals, counsel alleged before this Court that the state had delayed more than the 120 days permitted by the federal district court for retrial. In a written opinion, this Court denied Pruett's petition to bar his retrial. Pruett v. State, 512 So.2d 689 (Miss. 1987). This was not a frivolous matter. Id. at 693 (Robertson, J., dissenting, joined by Prather and Sullivan, JJ.) Counsel also appeared in defense of the trial court's order closing pre-trial proceedings, which this Court affirmed unanimously. See, Mississippi Publishers Corp. v. Coleman, 515 So.2d 1163 (Miss. 1987). Counsel also brought other matters to this Court for decision. These included applications for review of the trial court's denial of his double jeopardy motion, his motion to recuse the trial judge and his motion to disqualify the district attorney.
We must remember that the above proceedings included the appellate aspect of the trial. As with all capital litigation, numerous pre-trial motions were heard. In particular, over 100 motions were filed and litigated in the pre-trial proceedings. Each one of these pre-trial motions required investigation, research and writing far beyond that required in the average criminal case. For example, this case presented the question of the admissibility of testimony of witnesses who had been hypnotized;[8] review of videotapes and FBI documents and extensive consultation with experts.
Pruett's investigation and pre-trial motions also involved the admissibility of as many as twelve statements to law enforcement officers and the media. Counsel obviously challenged these statements on varied legal grounds. The record reflects that counsel required extensive preparation in various fields of expertise, including hypnotism, pathology, psychiatry and psychology.
While preparing for trial, counsel also conducted a thorough investigation to find witnesses in Pruett's favor. Because Pruett is not a native Mississippian, his counsel were required to go to other states to investigate his history and background. Of course, their investigation was to assist in both the guilt and penalty phases of the trial.[9]
The actual trial from voir dire through the verdict consumed over four weeks. The selection of the jury itself lasted eleven days. Pre-trial hearings lasted over nine days. As a matter of fact, each attorney spent almost 200 hours in the courtroom. Just for court time, the attorneys were paid slightly more than $5 per hour. This handsome rate decreases substantially when time for trial preparation is factored in.[10]
Pruett's counsel paid the price, unlike *1350 anyone else involved in this case.[11] For example the trial court authorized payment of up to $5,000 for investigative services in the case. For 5 1/2 hours' work, one investigator was paid $275 or $50 per hour. A second investigator received $2,610, more than both attorneys involved, for time expended on the case. To emphasize the point further, the defense mental health experts were paid $2,545 and $3,154 respectively. The defense pathologist was paid $2,875 and Pruett's hypnosis expert was paid $3,250. A far more startling fact is that the court reporter was paid far more than defense counsel. See, Brief of Appellant at 6, n. 10; see also MISS. CODE ANN. § 25-7-65 (Supp. 1990) (jurors are to be paid not less than fifteen dollars and no more than forty dollars per day).[12]
Counsel for Pruett are not alone.[13] Other members of the Mississippi bar who participate in capital proceedings are rewarded with imminent financial ruin. In Mississippi, for example, a lawyer paid $25.36 per hour on overhead in 1988. See, 35 Mississippi Lawyer, No. 5, at 45 (March-April, 1989). Therefore, counsel may well have lost over $23 for every hour worked on the case.
This has impacted adversely upon the legal profession in this state. Because of the extreme financial hardship that capital proceedings bring with it, 82% of trial counsel who have represented indigent defendants in a capital murder case would either not accept another appointed case, or would be very reluctant to do so.[14] For the trial judges of this state, this renders the difficult task of persuading competent counsel to take capital cases virtually impossible. As explained by the trial judge in this very case:
An experienced attorney cannot adequately represent a defendant in a capital murder case. There are a limited number of lawyers with sufficient legal experience and criminal practice experience to adequately represent defendants in capital murder cases. In the Seventh Judicial District, this pool of attorneys has been exhausted for appointments to defend capital murder cases. * * * Because of the economic consequences to these lawyers caused by the $1,000.00 statutory fee limitation, I cannot repeatedly appoint these lawyers to defend capital murder cases. Because of the statutory fee limitation, therefore, there is a crisis in obtaining the appointment of adequate and competent counsel to represent indigent defendants in capital murder cases in this Circuit Court district.
See, Wilson v. State, 574 So.2d 1338, Vol. ___, T. 55-6 (Affidavit of William F. Coleman at ¶¶ 3, 5) (emphasis added).
It is against this backdrop that Pruett and Wilson appeal to this Court asserting that the limitation of the attorney fees is unconstitutional. The appellants suggest that we should rule that § 99-15-17, which *1351 requires a one thousand dollar limitation for counsel involved in capital cases, violates the state and federal constitutions when applied to a complex capital trial. They each give several theories to support this position.
In the end, we recognize the attorneys' responsibility to provide services to indigent criminal defendants. We, however, also recognize that the limitations outlined in § 99-15-17 are grossly inadequate and unreasonable. Therefore, trial courts must use their inherent powers to assure that counsel are appropriately compensated. Just as Judge Coleman asserts, the limitation has created a crisis that we must remedy. Before we address any issue, we reiterate that the Mississippi Constitution provides the sole adequate and independent state grounds for us to reach this conclusion.

II.

THE LIMITATION VIOLATES THE DOCTRINE OF SEPARATION OF POWERS.
Unlike the federal constitution, the state constitution specifically incorporates the doctrine of separation of powers:
Section 1. The powers of the government of the state of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another.
Section 2. No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others... .
Miss.Const. Art. 1 §§ 1, 2 (1890).
The doctrine of separation of powers as expressed in the 1890 Constitution cannot be overemphasized. See, Alexander v. State, by and through Allain, 441 So.2d 1329, 1335 (Miss. 1983); see also, Dye v. State, ex rel. Hale, 507 So.2d 332, 342-3, n. 17 (Miss. 1987). At the heart of this doctrine is that no officer of one department of government may exercise power at the core of the power constitutionally committed to one of the other departments. Hall v. State, 539 So.2d 1338, 1345 (Miss. 1989). Stated another way, since "the whole of the legislative power has been vested in the legislature ... [and] the whole of the executive has been vested in a separate and distinct [executive] department of our government," then the remaining branch, the judiciary, must remain independent and cannot be curtailed by any of the other two branches. Alexander, 441 So.2d at 1339.
Since Newell v. State, 308 So.2d 71, 76 (Miss. 1975), this Court has expressed time and time again its inherent power to make rules that affect the Court. See, e.g., In re Mississippi Judicial Information System, 533 So.2d 1110 (Miss. 1988) (establishing judicial information system); Southern Farm Bureau Casualty Ins. Co. v. Holland, 469 So.2d 55, 62 (Miss. 1984) (Anderson, J., specially concurring, joined by Prather, Robertson and Sullivan, JJ.,) City of Mound Bayou v. Ray Collins Construction Co., 457 So.2d 337, 342 (Miss. 1984) (Supreme Court rule supersedes statute); Glenn v. Herring, 415 So.2d 695, 696 (Miss. 1982) (statute requiring disposition of cases by judges within six months unconstitutional); Jackson v. State, 337 So.2d 1242, 1253 (Miss. 1976) (since death penalty statute was unconstitutional, Court promulgated guidelines for bifurcated trial in capital cases); See also, State v. Caldwell, 492 So.2d 575, 576 (Miss. 1986), judgment vacated, 479 U.S. 1075, 107 S.Ct. 1269, 94 L.Ed.2d 130 (1987) (court has "inherent power to procedurally control its business."); Riely v. State, 562 So.2d 1206, 1211 (Miss. 1990) (statute is constitutional on its face as construed and complemented by this opinion). Moreover, this Court has adopted the principle that even if a law or procedure is efficient, convenient and useful in facilitating functions of government it cannot be spared when it is contrary to the constitution. Alexander, 441 So.2d at 1339 (quoting INS v. Chadha, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780-81, 77 L.Ed.2d 317, 340 (1983)).

*1352 A.

SUPREME COURT MAY MAKE THE RULES BUT WHAT ABOUT THE MONEY?
As a corollary of the duty to promulgate rules governing practice in the courts, this Court has the "duty to protect itself, the judiciary and the citizens of this State * * * [and] it is the duty of this Court to assure such financing so its agencies can properly and meaningfully discharge the `jurisdiction and lawful powers as are necessary to conduct a proper and speedy disposition of any complaint' ..." In the Matter of the Mississippi State Bar, 361 So.2d 503, 506 (Miss. 1978) (citation omitted) (emphasis added). Accord Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 52, 274 A.2d 193, 197, cert. denied, 402 U.S. 974, 91 S.Ct. 1665, 29 L.Ed.2d 138 (1971) (courts "must possess the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities and its power and duties to administer Justice").
We have reasserted our authority to guarantee adequate financing for the judiciary. In Hosford v. State, 525 So.2d 789, 797-8 (Miss. 1988), this Court, speaking through Presiding Justice Hawkins, had this to say concerning responsibilities of the legislature and judiciary in adequately financing the courts:
The same Constitutional requirement for our courts to exist obviously carries with it the duty on the part of the Legislative branch to provide sufficient funds and facilities for them to operate independently and effectively. Any holding otherwise would emasculate the constitutional mandate for three separate and co-equal branches of government by reducing the courts to supplicants only of the Legislature.
Of course, courts very largely are supplicants of the Legislative branch, with that branch providing the funds and facilities for courts to operate. And, it is not what judges individually or collectively think they should receive which controls, but what the legislature in its wisdom decides. The discretionary authority of the legislature is wide indeed, but it does not cover quite all of the spectrum. If it fails to fulfill a constitutional obligation to enable the judicial branch to operate independently and effectively, then it has violated its Constitutional mandate, and the judicial branch has the authority as well as the duty to see that courts do not atrophy. No court created by the Constitution is required to accept conditions which prevent it from operating independently and effectively. Such court also has the duty under our governmental system to protect its own integrity. It likewise has the inherent authority as part of a separate and co-equal branch to make such orders to insure that independence and integrity... .
... [I]f [the Legislature] fails in its constitutional mandate to furnish the absolute essentials required for the operation of an independent and effective court, then no court affected thereby should fail to act. It is the absolute duty of a court in such latter circumstances to act, and act promptly.

* * * [T]here is no fourth branch of government to turn to for protection and the judiciary can protect itself.
(emphasis added).
Since the court can order renovation of the courthouse, the physical structure where the judiciary determines the fate of criminal defendants, we also must have some say in determining the method or factors involved in guaranteeing adequate payment to the attorneys who represent those criminal defendants. Our authority is reinforced because the courts are under a constitutional obligation to provide the accused in a felony case with counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).[15]See also, *1353 MISS. CODE ANN. § 99-15-15; Unif.Crim. R.Cir.Ct.Prac. 1.05; Cf. In the Matter of the Court Reorganization Plan of Hudson County, 161 N.J. Super. 483, 391 A.2d 1255, 1259 (1978), aff'd 78 N.J. 498, 396 A.2d 1144 (1979) (a court has the inherent power to provide the facilities, personnel and resources reasonably necessary for the performance of the judicial functions in the county. "And as a corollary thereof [a judge] must have the power to compel the appropriation and expenditure of funds by the coequal executive and legislative branches of government to accomplish such purpose, subject only to the bounds of reasonable discretion") (citations omitted); see also, State ex rel. Johnston v. Taulbee, 66 Ohio St.2d 417, 423 N.E.2d 80, 82 (1981) (courts possess inherent powers to effectuate an orderly and efficient administration of justice without being financially or procedurally inhibited by the General Assembly); Pena v. District Court of Second Judicial District, 681 P.2d 953, 956 (Colo. 1984) (the general rule is that the judicial branch of government possesses the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities); Taylor v. Oxford, 575 F.2d 152, 154 (7th Cir.1978) ("Among the courts' administrative type functions is the appointment of attorneys in criminal cases"); Washington v. Estelle, 648 F.2d 276, 281 (5th Cir.1981), cert. denied 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981) (same).
Based on the foregoing, it is clear that it is the court's perogative, not the legislature's, to fulfill that function. We, however, are mindful of Young v. State, 255 So.2d 318, 321 (Miss. 1971). In that case, this Court held that the matter of compensation for an attorney appointed to defend an accused in a criminal matter is a legislative matter rather than a judicial matter. In discussing that central concern this Court held:
the amount of compensation provided of counsel for the appellant was not so low that it was tantamount to denying appellant due process, and we reaffirm our previous holding that the matter of compensation of an attorney appointed to represent an indigent defendant is a matter that rests solely with the legislature as a legislative function.
255 So.2d at 322 (emphasis added); see also, Board of Supervisors of George County v. Bailey, 236 So.2d 420 (Miss. 1970).[16]
Before arriving at that conclusion, however, the Court said:
[R]epresentation of indigents under a court order, without a fee except as modified by statute, is a condition which lawyers are licensed to practice in the State of Mississippi as officers of the court. Since the right to practice law is a privilege that is conferred by the State, attorneys can be required to make a reasonable *1354 contribution of their time and services as an aid to the effective administration of justice.
Id. at 321 (emphasis added).
Our decisions in Newell, supra, 308 So.2d 71 and progeny virtually have nullified Young's holding. In any event, were we to continue to subscribe to the language in Young, we would simply ask this question: Was compensation in the cases sub judice so low that it amounted to a denial of due process? In answering that question we have to answer the question in the affirmative. Therefore, the matter of compensation would not rest solely with the Legislature. Newell and its progeny notwithstanding, we would still have to reach a different conclusion than the one reached in Young.[17]
We recognize our inherent power "to allow ... departure from the statute's fee guidelines ..." White v. Board, 537 So.2d at 1378 (quoting Makemson, 491 So.2d at 115). It necessarily follows that the legislative body responsible for funding the courts may be "obliged to appropriate and thus provide sufficient funds ... to sustain the public advocacy system... ." Boyle County Fiscal Court v. Shewmaker, 666 S.W.2d 759, 762 (Ky.App. 1984); Accord State v. Robinson, 123 N.H. 665, 465 A.2d 1214, 1217 (1983); Reist v. Bay County Circuit Judge, 396 Mich. 326, 241 N.W.2d 55, 66 (1976); Kovarik v. County of Banner, 192 Neb. 816, 224 N.W.2d 761, 765 (1975). See also People v. Randolph, 35 Ill.2d 24, 30, 219 N.E.2d 337, 340 (1966) (inherent power to appoint counsel "necessarily includes the power to enter an appropriate order ensuring that counsel do not suffer an intolerable sacrifice and burden."); Smith v. State, 118 N.H. 764, 394 A.2d 834, 838-39 (1978) ("It is peculiarly within the judicial province to ascertain reasonable compensation when the person who performs the services is acting under court appointment as an officer of the court"); Bias v. State, 568 P.2d 1269, 1271-72 (Okla. 1977) (inherent power to appoint counsel includes power to ensure counsel does not suffer an intolerable sacrifice; extraordinary professional time and expenses to be compensated); State v. Lehman, 137 Wis.2d 65, 403 N.W.2d 438, 447 (1987) (court's inherent power to appoint counsel carries with it the power to order payment). But see, State v. Ruiz, 269 Ark. 331, 335, 602 S.W.2d 625, 627 (1980); Huskey v. State, 743 S.W.2d 609 (Tenn. 1988).
The courts are constitutionally required to appoint counsel, and it is this Court's function to establish all the procedures without "trespass" by the Legislature. Dye v. State Ex rel. Hale, 507 So.2d at 343. "There is no right more essential than the right to assistance of counsel." Lakeside v. Oregon, 435 U.S. 333, 341, 98 S.Ct. 1091, *1355 1096, 55 L.Ed.2d 319 (1978). And, because death is different, the statutory limitation as applied is an infringement upon this Court's authority.[18]
This Court must exercise its inherent authority. We take this route rather than declaring the statute unconstitutional. We, however, do believe the statute impinges upon several other fundamental rights; therefore, it is absolutely necessary that we use our inherent authority mandated by our Constitution. Hosford, 525 So.2d at 798. In addressing the following issues, we note that the clashes between the statute and the exercise of fundamental rights also have persuaded this Court to invoke its inherent obligation.

B.

THE LIMITATION IMPINGES UPON THE CONSCIENTIOUS ATTORNEY'S FIFTH AMENDMENT RIGHT TO PROPERTY
The Fifth Amendment to the U.S. Constitution forbids government expropriation of private possessions stating, "nor shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. V. Section 17 of the Mississippi Constitution 1890, on the other hand, provides that
private property shall not be taken or damaged[19] for public use except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.
As a consequence of this language, in discussing the cases sub judice on this ground, we do so relying solely on our state constitution without reaching the federal question. Cf. DeLisio v. Alaska Superior Court, 740 P.2d 437, 439 n. 3 (Alaska 1987) (Alaska's constitution affords property owner broader Fifth Amendment protection than the Federal Constitution; therefore, no need to consider federal claim).
Under the federal constitution, "the right to practice law has been held to be a property *1356 right within the meaning of the due process and equal protection provisions of the Fourteenth Amendment... ." Weiner v. Fulton County, 113 Ga. App. 343, 148 S.E.2d 143, 145, cert. denied 385 U.S. 958, 87 S.Ct. 393, 17 L.Ed.2d 304 (1966) (citing Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957)). As a matter of federal law, "[f]rom this it follows that an attorney from whom services are demanded and by whom they are given has a property right in his fee for those services which ... should be based on their just and reasonable value." Weiner, 148 S.E.2d at 145; Bias v. State, 568 P.2d 1269, 1270 (Okla. 1977); Bedford v. Salt Lake County, 22 Utah 2d 12, 447 P.2d 193, 195 (1968); Warner v. Commonwealth, 400 S.W.2d 209, 211 (Ky. 1966), cert. denied 385 U.S. 858, 87 S.Ct. 108, 17 L.Ed.2d 85 (1966); State ex rel. Partain v. Oakley, 159 W. Va. 805, 227 S.E.2d 314 (1976); Knox County Council v. State, 217 Ind. 493, 29 N.E.2d 405, 408 (1940). But Cf. DeLisio, 740 P.2d at 443 (measure of value will not necessarily reflect any specific attorney's normal rate of compensation, but rather will reflect the compensation received by the average competent attorney operating on the open market); Makemson, 491 So.2d at 1113 (Petitioners seek only "reasonable" and not "market value" compensation. Token compensation is no longer an alternative.) (emphasis added).
Although this Court has not explicitly stated so, we have recognized for a long time that lawyering, as well as other vocations, is a fundamental right for
[l]iberty, in its broad sense, must consist of the right to follow any of the ordinary callings of life without being trammeled ... The right to follow any of the common occupations of life is an inalienable right... . It was formulated as such under the phrase `pursuit of happiness' in the [D]eclaration of [I]ndependence ... This right is a large ingredient in the civil liberty of the citizen.
Wilby v. State, 93 Miss. 767, 772-73, 47 So. 465, 466-67 (1908) (quoting State v. Smith, 42 Wash. 237, 84 P. 851, 854 (1906)); see also Moore v. Grillis, 205 Miss. 865, 39 So.2d 505, 511 (1949).
By virtue of this language, it is obvious that the attorneys' work must be property. Therefore, if an attorney is "compelled to part with his property for public use, [it is] only on full payment for it and any right in relation to it." Sarphie v. Mississippi State Highway Commission, 275 So.2d 381, 383 (Miss. 1973) (emphasis in the original). Cf. Delisio, 740 P.2d at 439 (the intent of the Alaskan "takings clause" is "to ensure that individuals are not unfairly burdened by disproportionately bearing the cost of projects intended to benefit the general public").
We, however, remain mindful of our decision in Young, 255 So.2d at 321, which addressed this takings issue and followed the position that the Alaskan Supreme Court announced in Jackson v. State, 413 P.2d 488 (1966). Aside from the fact that we have impliedly overruled the dicta in Young, supra, the Alaskan Supreme Court has taken the additional step and expressly overruled Jackson. See, DeLisio, 740 P.2d at 439. In Young, this Court noted that an attorney, as an officer of the court, is obligated to provide services for indigents without payment. The Court indicated that this principle "is so firmly established in the history of the courts and the legal profession that it may be said to be a condition under which lawyers are licensed to practice as officers of the court." 255 So.2d at 321 quoting Jackson, 413 P.2d at 490.
While reflecting on that same language, the DeLisio Court held that "[w]e are now convinced that the attorney may not be denied reasonable compensation on the basis of this tradition." 740 P.2d at 441. Today, we likewise see no reason why tradition alone should prohibit an attorney from receiving reasonable compensation for services rendered to the public.
While further addressing this takings issue in Young, the only other case that this Court principally relied on was United *1357 States v. Dillon. Quoting from Dillon, this Court stated:
Appellant's brief contains a very complete and scholarly treatise which in our view establishes an obligation on the part of the legal profession to represent indigents upon court order, without compensation ... [T]he obligation of the legal profession to serve indigents on court order is an ancient and established tradition, and that appointed counsel have generally been compensated, if at all, only by statutory fees which would be inadequate under just compensation, and which are usually payable only in a limited types of cases ... [T]he vast majority of the courts which have passed on the question have denied claims of appointed counsel for nonstatutory just compensation, pointing out that representation of indigents under court order, without a fee, is a condition under which lawyers are licensed to practice as officers of the court, and that the obligation of the legal profession to serve without compensation has been modified only by statute. An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a `taking of his services.'
255 So.2d at 320-21 quoting Dillon, 346 F.2d 633, 635, cert. denied, 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966) (citations omitted).[20]
As noted in Jewell, however, "the historical argument advanced in Dillon was decimated in a law review article by Professor David Shapiro, The Enigma of the Lawyers' Duty to Serve, 55 N.Y.U.L.Rev. 735, 740-53 (1980)." 383 S.E.2d at 543 (emphasis added). Accord. Stephan v. Smith, 747 P.2d at 841 (The later cases reflect a definite trend toward recognizing that the historical condition which the duty to provide free legal services evolved no longer exists in modern America); DeLisio, 740 P.2d 437, 441 ("[c]ompulsory representation of indigent defendants without full compensation ... is neither as traditional nor as venerable as had been previously supposed. More importantly ... tradition alone, regardless of this venerability, cannot validate an otherwise unconstitutional practice"). Another court has explained it this way:
An attorney who is appointed to represent an indigent without compensation is effectively to give away a portion of his property  his livelihood, other professionals, merchants, artisans, and state licensees, are not similarly required to donate services and goods to the poor.
The lawyer's stock in trade is intangible  his time fortified by his intellectual and personal qualities, and burdened by his office expenses. To take his stock in trade is like stripping the shelves of the grocer or taking over a subdivision of the builder.
Cunningham, 177 Cal. App.3d at 348-49, 222 Cal. Rptr. at 862 (quoting Cheatham, Availability of Legal Services: The Responsibility of the Individual and of the Organized Bar, 12 U.C.L.A.L.Rev. 438, 444 (1965); see also, Comment, The Uncompensated Appointed Counsel System: A Constitutional and Social Transgression, 60 Ky.L.J. 710, 715 (1972); see also Lynch, 796 P.2d at 1156-57. Cf. Family Division Trial Lawyers v. Moultrie, 725 F.2d 695 (D.C. Cir.1984) (attorneys' pro bono requirements do not constitute a taking; however, an unreasonable amount of required uncompensated service might so qualify. *1358 Moreover, at some point the burden on a particular attorney could become so excessive that it might rise to the level of a taking of property).
In light of these fundamental principles, it is obvious and we so hold that just compensation was not paid to Messrs. Bright, Singleton, Horn and Powell, and others like them. In a different context we have determined that "[v]alue ... refers to the familiar appraisal and economic concept of fair market value." Trustees of Wade Baptist v. Mississippi State Highway Commission, 469 So.2d 1240, 1244 (Miss. 1985); see also Mississippi State Highway Commission v. Owen, 308 So.2d 228, 230 (Miss. 1975) ([value equals] difference between fair market value before and after taking); Mississippi State Highway Commission v. McArn, 246 So.2d 512, 514 (Miss. 1971).
The money counsel received in the cases sub judice amounted to no more than token compensation, and it simply was confiscatory of their time, energy and talent. Makemson, 491 So.2d at 1115. The effect of the statutory limitation has impinged upon counsel's services, their property. See, Morris, Constitutional Law: Validity of Attorney Fee Caps in Indigent Cases: Mississippi's Challenge, 9 M.C.L.Rev. 373, 390 (1989). So that other counsel will not be compelled to sacrifice as counsel in these cases, we do establish appropriate guidelines. Before detailing these guidelines, however, we must discuss other concerns which require that we act.

C.

THE LIMITATION IMPINGES UPON THE INDIGENT DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
Each state has a constitutional obligation to provide indigent defendants in all felony cases with assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).[21] This right has been interpreted to mean the right to effective assistance of counsel for the state has a compelling interest to ensure "that the defendant at the trial [is] given a realistic and meaningful opportunity to assert and enjoy all rights secured to him by the Constitution and laws." Read v. State, 430 So.2d 832, 837, 841 (Miss. 1983). Cf. Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) ("Both stages of the prosecution, [trial and appeal], although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over."); see also, Waldrop v. State, 506 So.2d 273, 275 (Miss. 1987); accord Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[22] The state's interest is even more compelling in capital cases. See, supra, 1344-1346. According to Pruett, "[t]he *1359 failure to provide adequate funding for court-appointed counsel tends inevitably to curtail this most fundamental right." (Brief of Appellant at 22).
Although the issue in this case remains the same  the right to effective assistance of counsel  the analysis of the constitutional claim in the case sub judice differs considerably from the usual post-conviction ineffectiveness challenge. When an appellate court reviews counsel's performance in a post-conviction proceeding, the strong judicial interest in finality precludes the court from acting the Monday morning quarterback.
Under the Strickland standard, "[j]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. at 2065. Accord. Evans v. State, 485 So.2d 276, 281 (Miss. 1986). Moreover, requiring intensive scrutiny of counsel during post trial performance would adversely affect his performance and even his willingness to serve. Stated another way, "rigid requirements for acceptable assistance [made after trial] could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between the attorney and client." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. Simply put, when retrospectively reviewing counsel's performance, the court's purpose "is not to improve the quality of legal representation although that is a goal of considerable importance to the legal system." Id. at 689, 104 S.Ct. at 2065 (emphasis added). But, it is crucial that the "defendant has the assistance necessary to justify reliance on the outcome of the proceeding." Id. at 692, 104 S.Ct. at 2067.
On the other hand, when this Court acts in its role of supervising the judiciary, very different concerns control the evaluation under the Sixth Amendment and Section 26. Cf. BRIEF OF APPELLEE in Wilson v. State, at 48-9 (State's most demanding and far reaching responsibility in criminal law is to protect the innocent, to prosecute and punish the guilty, and in all cases to see that justice is done in accord with constitutional imperative). Now, there is no issue of finality  except insofar as better legal representation would better assure finality in capital cases. Cf. State v. Tokman, 564 So.2d 1339 (Miss. 1990) (counsel found ineffective); Leatherwood v. State, 539 So.2d 1378 (Miss. 1989) (same); Jones v. Thigpen, 788 F.2d 1101 (5th Cir.1986). Furthermore, the financial disincentives in the current system for appointing counsel act to discourage the acceptance of assigned cases, dampen the ardor of counsel, and reduce the quality of legal representation. Cf. Luckey v. Harris, 860 F.2d 1012, 1017 (11th Cir.1988) ("[S]ixth [A]mendment protects rights that do not affect the outcome of a trial. Thus, deficiencies that do not meet the [Strickland] `ineffectiveness' standard may nonetheless violate a defendant's rights under the [S]ixth [A]mendment").
For this reason, in order to show a constitutional violation in the system as applied, it is not necessary that it be shown that all defendants who are represented by inadequately funded attorneys, were provided with assistance below the minimum standards set forth in Strickland.[23] This Court finds that the statutory scheme adversely affects the right to counsel without finding that counsel's performance in this case fell below the minimum standards. It is important to note as one court held:
even though the record in this particular case does not indicate that the defendant was inadequately represented[, t]he fact that one felony defendant out of 149 felony defendants was given minimum *1360 adequate representation does not mean that others were properly represented.
State v. Smith, 140 Ariz. 355, 681 P.2d 1374, 1381 (1984). Because these are capital cases, this Court ensures that all defendants in capital cases are effectively represented.[24]
The evidence provided in this case suggests that the current statutory scheme encourages the appointment of less qualified lawyers to capital cases. As Judge William F. Coleman notes in his affidavit:
An inexperienced attorney cannot adequate [sic] represent a defendant in a capital murder case. There are a limited number of lawyers with sufficient legal experience and criminal practice experience to adequately represent defendants in capital murder cases. In the Seventh Judicial District, this pool of attorneys had been exhausted for appointments to defendant capital murder cases.
* * * * * *
Criminal defense lawyers are solo practitioners or from small law firms. Because of the economic consequences to these lawyers caused by the $1,000.00 statutory limitation, I cannot repeatedly appoint these lawyers to defend capital murder cases. Because of the statutory fee limitation, therefore, there is a crisis in obtaining the appointment of adequate and competent counsel to represent indigent defendants in capital murder cases in this Circuit Court district.
Affidavit of William F. Coleman (Wilson Record at 55-6) (emphasis added).[25] The financial trauma which results from taking a capital case is effectively eliminating most experienced attorneys from ever taking another case.[26]
Undoubtedly the statutory limitation on fees has created this predicament that Judge Coleman and other circuit judges face. We cannot deny that "[i]n our pecuniary culture the caliber of personal services rendered usually has a corresponding relationship to the compensation provided." Makemson, 491 So.2d at 1114-115 (quoting MacKenzie v. Hillsborough County, 288 So.2d 200, 202 (Fla. 1973) (dissenting, opinion)).
The one thousand dollar limitation acts as an obvious disincentive to the lawyers involved. For every additional hour's work, the hourly fee decreases, until it finally slips below the minimum wage. Cf. Jewell, 383 S.E.2d at 544 ("[I]t is unrealistic to expect all appointed counsel with office bills to pay and families to support to remain insulated from the economic reality of losing money each hour they work."); Cunningham, 177 Cal. App.3d at 355, 222 Cal. Rptr. at 866 ("The more conscientiously the attorney fights for the indigent's cause, the greater chance of the attorney's financial loss."); see also, Stephan v. Smith, 747 P.2d at 835 (A lawyer has a right to make a living). While conscientious lawyers might take one capital case every few years, as a quasi-pro bono commitment, financial pressures militate against lawyers regularly taking cases, thereby building specialized knowledge in this most complex legal field.
A defendant's right to effective representation and the attorneys right to fair compensation is "inextricably interlinked." Makemson, 491 So.2d at 1112. This point has been emphasized on numerous occasions. See, e.g. Ferri v. Ackerman, 444 U.S. 193, 199, 100 S.Ct. 402, 406-07, 62 *1361 L.Ed.2d 355 (1979) (Congress established reasonable compensation for lawyers in the Criminal Justice Act of 1964 "[i]n response to evidence that unpaid appointed counsel were sometimes less diligent or less thorough than retained counsel ...") (footnote omitted); Strickland v. Washington, 466 U.S. at 708, 104 S.Ct. at 2075 (Marshall, J., dissenting) ("It is an unfortunate but undeniable fact that a person of means ... usually can obtain better representation than that available to an indigent defendant ..."); see also, White v. Commissioners of Pinellas County, 537 So.2d 1376, 1380 ("[R]elationship between an attorney's compensation and the quality of his or her representation cannot be ignored"); Cunningham, 177 Cal. App.3d at 355, 222 Cal. Rptr. 866 ("it may be unrealistic to expect the satisfaction which arises from performing a charitable act [ie., free services to the indigent] to constitute the sole motivation to expend maximum effort."); Jewell, 383 S.E.2d at 540 ("[L]ow hourly fee may prompt an appointed lawyer to advise a client to plead guilty, although the same lawyer would advise a paying client in a similar case to demand a trial."); Cf. McLaughlin v. Royster, 346 F. Supp. 297, 300 (E.D.Va. 1972) (Attorney admitted that had he "been employed and paid to represent [defendant] he would have proceeded in the case differently ... [and] interviewed more people"); In the Matter of Dale, 37 N.C. App. 680, 681, 247 S.E.2d 246, 248 (1978) (Attorney failed to file an appeal for indigent client sentenced to death because "I didn't have a savings account or any funds in the bank that I could live on. It was just a matter of me having to live and placing my priority on living instead of doing what I should have been doing..."); In the Matter of Hunoval, 294 N.C. 740, 741, 247 S.E.2d 230, 231 (1977) (Attorney who represented indigent defendant at trial in a capital case later won a stay of execution, but he never filed a petition for certiorari and supporting brief to the United States Supreme Court because he was dissatisfied with the fee allowed in prosecuting the appeal, and "[he] [could] not justify working for nothing or at a rate less than that received by a garage mechanic.").[27]
Even if we were to deny relief on the other propositions presented thus far, this point  that the statutory cap curbs criminal defendants' right to effective assistance of counsel can not be refuted. As Makemson pointed out:
... [W]e find that the statutory maximum fees, as inflexibly imposed in cases involving unusual or extraordinary circumstances,[28] interfere with the defendant's [S]ixth [A]mendment right `to counsel for his defence.' The statute, as applied to many of today's cases, provides for only token compensation. The availability of effective counsel is therefore called into question in those cases when it is needed most.
491 So.2d at 1112 (emphasis added).
Consequently, Mississippi's inflexible statutory limitation frustrates indigent defendants' *1362 rights to effective assistance of Counsel. This is particularly so in capital trials, which consist of two separate trails. Moreover, the fee has the affect of encouraging counsel to perform deficiently. Because our system has created these deficiencies, we must act or we would fail in upholding our Constitutional mandate.

D.

THE LIMITATION ACTS IN VIOLATION OF THE EQUAL PROTECTION CLAUSE
In laying the foundation for this proposition, Pruett argues "[s]ince the right to assistance of counsel is constitutionally guaranteed, it is clearly a fundamental interest. Thus the indigent defendant's claim that the state action (providing uncompensated counsel) impinges upon that fundamental right should be subject to intensive judicial scrutiny under traditional equal protection analysis." (BRIEF OF APPELLANT at 26) quoting Note, Uncompensated Appointments of Attorneys for Indigent Criminal Defense: The Need for Supreme Court Standards, 14 S.W.U. L.Rev. 389, 403 (1984) (footnote omitted).
As to the indigent defendant, "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." Griffin v. Illinois, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956). As a matter of fact, "all people charged with [a] crime must, so far as the law is concerned, `stand on an equality before the bar of justice in every American court.'" Id. at 17, 76 S.Ct. at 590. The appellants assert that when court-appointed counsel is so woefully underpaid this equality does not exist.[29]
Pruett and Wilson also raise a secondary argument in support of this contention. They explain that § 99-15-17 also implicates counsel's fundamental right to property and for this reason it also "enter[s] the realm of strict judicial scrutiny, [where] there can be no doubt that `administrative convenience is not a shibboleth, the mere recitation of which dictate constitutionality.'" City of Richmond v. Croson, Co., 488 U.S. 469, 509, 109 S.Ct. 706, 729, 102 L.Ed.2d 854, 891 (1989) (quoting Frontiero v. Richardson, 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973).
When an attorney engages in his profession (ie., criminal defense) he is "exercising a constitutional right,[30] and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest is unconstitutional." Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (emphasis in original). Obviously, the state has a strong interest in providing legal services to the poor, but it is neither necessary, nor permissible, for the cost of this program to be shouldered by a small group of lawyers without offending the equal protection clause. As the court in Lynch noted, a lawyer's calling is different from other licensed professionals. 796 P.2d at 1157. But, this, in no way, should allow the public to shirk the responsibility of providing right to counsel to the indigent. That responsibility can not be borne entirely by the private bar. Stephan v. Smith, 747 P.2d at 841. "While ... attorneys are not required to serve indigent defendants without compensation, the effect is similar if their overhead and out-of-pocket expenses are not covered by the compensation they receive." Id: at 844. There is no way the meager compensation allowed by the statute could cover the overhead or out of pocket expenses of counsel involved in these cases.[31]
In addition to Stephan v. Smith, supra, and Cunningham, supra, other courts have found the application of stringent fee *1363 limitations similar to ours as a violation of the equal protection clause. See, e.g., Lynch, supra, 796 P.2d 1150; In the Interest of D.B., 385 So.2d 83, 92 (Fla. 1980); State v. Rush, 46 N.J. 399, 412-13, 217 A.2d 441 (1966); see also Menin v. Menin, 79 Misc.2d 285, 359 N.Y.S.2d 721 (1974) (due process clause). We agree with the appellants in these causes. Our statute binds attorneys to perform a gargantuan task, and it also forces them to shoulder entirely the public's burden of financing our indigent defense system. Accord BRIEF OF APPELLEE in Wilson at 48 (The burden of defending capital litigation has been placed on the private bar in Mississippi "even where a public defender may have been provided for indigent defense generally").
Because the appellants in these cases have provided in detail numerous reasons which justify this Court to act on this critical matter, we now put forth a remedy.

III.

WHAT ARE ATTORNEYS TO BE PAID?
We have noted our obligation to assure that indigent criminal defendants have counsel appointed to them. We also have indicated that lawyers must be paid for their services, and we cannot expect counsel to be effective advocates without adequate and reasonable compensation.[32] The token compensation allowed by our statute simply is not enough to allow courts to uphold their constitutional mandate.[33]
In devising a scheme that adequately compensates court appointed counsel, we first note that the Legislature has been put on notice that a problem exists with our indigent criminal defense system. In 1980, the Mississippi Judicial Council sponsored a report critical of our system of assigned counsel. The report recommended that Mississippi adopt a more efficient public defender system and standardize compensation for auxilary assigned counsel "based on prevailing rates for private counsel." See, Brief of Amicus Curiae Mississippi State Bar Association, citing Mississippi Courts: Organization and Management Analysis, in V Mississippi Court Finance Study 71-108 (Ernest H. Short and Associates, Inc. March 1980). Following the release of this study, the Legislature refused to authorize a requested interim study commission to review the extensive finding of the Judicial Council. See, Lefstein, Criminal Defense Services for the Poor, 58, A-50 (1982). Since that time, however, the Legislature established the limits effective in § 99-15-17. These limits have been in place since 1980, and they have remained until today.
As the Attorney General recognized in his brief, the possibility that the statute would remain in tact as is exists because "most recently ... Senate Bill 2264 and House Bills 582 and 628, all of which sought in one form or another to increase compensation for appointed counsel including compensation for defense of captial litigation, died in committee in the 1989 legislative session." BRIEF OF APPELLEE at 48, n. 33.[34] We, therefore, take this opportunity, as we are sworn to do, to establish guidelines which give equal justice to the poor and the rich.
Before doing so, however, we first reject the state's proposal to place a statutory cap of $25 an hour for counsel representing an *1364 indigent criminal defendant during capital litigation. Not only would the state place a cap on the hourly rate, but it also recommends that those attorneys could only be paid for no more than two hundred hours. This in essence allows for a maximum of $5,000.
Arbitrarily limiting the number of hours that an attorney can work (and be paid for) in representing criminal defendants raises grave constitutional concerns. See, supra, at 1355-1358. We already have emphasized the nature of criminal proceedings in general and capital litigation in particular. Were we to subscribe to this proposal, counsel for Pruett would go uncompensated for a total of 532 hours, and Wilson's counsel would not be compensated for 541.2 hours.[35] Because of our serious role in this type of litigation, we can not put a limitation on the number of hours that an attorney can be paid for in in representing an indigent defendant defendant, who is facing incarceration or death.
In suggesting that there be a $25 hour cap for counsel representing indigent criminal defendants, the state calculates this hourly wage by equating defense counsel's rate to that of a district attorney. MISS. CODE ANN. § 25-3-32 sets the district attorney's salary at 90% of the circuit judge's salary. Therefore, his salary is $59,580.00 and based on a 40-hour work week the district attorney earns $28.64 per hour. An Assistant District Attorney's salary ranges from $15,000 to 85% of the salary of the district attorney. Consequently, the highest paid assistant district attorney would make $50,643.00. Based on these figures assistant district attorneys make between $7.21 and $24.35 per hour. See, MISS. CODE ANN. § 25-31-5(4) (Supp. 1990).
Although this rate proposed by the state is slightly less than the district attorney, the fact that the state offers to establish counsel's hourly rate by tying it to the hourly rate of the district attorney is not an unreasonable approach. Cf. Lynch, 796 P.2d at 1161 ("most even handed approach in setting fees is to tie the hourly rate of the counsel appointed for the indigent defendant to the hourly rate of the prosecutor/district attorney and the public defenders"). As a matter of fact, the appellants concur that the approach could be the appropriate remedy.
The state's hourly rate for the district attorney, however, does not include the office's overhead and litigation expense which the state provides. Stated another way, a district attorney's salary is pure profit to him because he has to pay no expenses from it. This includes the salary of her assistants and any investigator or other investigating officers who assist in investigation the case.
A lawyer in practice must pay his overhead and other expenses from the fees that he earns. Therefore, "[i]n order to place the counsel for defense on an equal footing with counsel for the prosecution, provision must be made for compensation of defense counsel's reasonable overhead and out of pocket expenses." Lynch, 796 P.2d at 1161. According to Pruett, a Mississippi lawyer's average office overhead is $25.36. Consequently, even at this amount that the state insists is reasonable would not cover counsel's overhead expenses. Inevitably, the state's remedy would still impinge upon those constitutional guarantees that we have considered. See, supra at 1355-1358. Furthermore, the $25 per hour rate proposed by the state is even less than the $26.12 hourly rate which the Florida Supreme Court characterized as "far from reasonable compensation" for an attorney who has "the dreadful responsibility of trying to save a man from [execution]." White v. Board of Commissioners, 537 So.2d at 1379.
In establishing a proper amount we note that the federal system recognizes the need for adequately compensated counsel for indigent criminal defendants. The Criminal Justice Act of 1964 provides for court appointed counsel to be paid $75 per hour for *1365 in court time; $40 for out-of-court time, and the $3,500 maximum may be waived "for extended or complex representation." 18 U.S.C.A. § 3006A(d) (Supp. 1990). The Anti-Drug Abuse Act of 1988 provides that in a post-conviction proceeding seeking to set aside a death sentence, the court is to appoint experienced attorney and pay "such rates or amounts as the court determines to be reasonably necessary." 21 U.S.C.A. § 848(q)(10) (Supp. 1990).
When we turn to our sister states, we find that Mississippi is radically out of step with most other jurisdictions. Of the thirty-seven states that continue to sponsor capital punishment, only Mississippi and Arkansas have a legislatively mandated $1,000 cap. Most states allow counsel to be paid at a reasonable rate, and they do not impose stringent limitations. See, e.g., ALA. CODE § 15-12-21 (Supp. 1990) (No maximum for in-court time and $1,00 maximum for out of court time; counsel receives reimbursement for expenses incurred); ARIZ. REV. STAT. ANN. § 13-4013 (1989) (compensation equals amount that court finds reasonable); CAL.PENAL CODE § 987.2 (West 1985) (Supp. 1990) (counsel receives reasonable compensation as determined by court); FLA. STAT. ANN. § 925.036 (West 1985) (Supp. 1990) (Maximum of $3,500 but the court may waive this amount)[36]; GA. CODE ANN. § 17-12-61 (1990) (Maximum set at $150, but court can look to § 17-12-5(b) and find extraordinary circumstances and therefore increase the award). See also, IDAHO CODE § 19-860 (Supp. 1990) (court awards reasonable rate of compensation, which is determined by complexity of the issues, time involved and other relevant considerations); MONT. CODE ANN. § 46-8-201 (Supp. 1989) (compensated reasonable rate to be determined by the judge); NEB. REV. STAT. § 29-1804.12 (1989) (judge awards all expenses reasonably necessary to permit counsel to effectively and competently represent his or her client. County must pay the full amount determined by the court); NEV.REV.STAT. § 7.125 (1987) ($6,000 maximum but court can waive this amount based on the complexity of the case; number of factual or legal issues; severity of the offense; time necessary to provide adequate defense or other special circumstances); N.C. GEN. STAT. § 7A-452 (1989) (Trial court awards reasonable compensation to be paid by state) (emphasis added); S.D. CODIFIED LAWS ANN. § 23A-40-8, (1988) (reasonable and just compensation fixed by judge for services and for necessary expenses and costs incident thereto); TEX. CODE CRIM. PROC. ANN. § art. 26.05 (Vernon 1989) (reasonable attorney fees based on labor required, complexity of case and experience and ability of appointed counsel); VA. CODE ANN. § 19.2-163 (1990) (trial court has sole discretion to fix amounts which are reasonable and reflective of time and effort expended on case); and WYO. STAT. § 7-6-109 (1987) (court appointed attorney shall be compensated for services with regard to complexity of the issue, the time involved, prevailing local fees of attorneys; the amount reasonably necessary to provide a defense as is required by constitutional process and other relevant consideration as determined by the court).
Aside from the flexible standards provided by the various states and the federal government, the ABA believes that "[c]apital counsel should be compensated for actual time and service performed. The objective should be to provide a reasonable rate of hourly compensation which is commensurate with the provision of effective assistance of counsel and which reflects the extraordinary responsibilities inherent in death penalty litigation." Guidelines in Death Penalty Cases, Guideline 10.1.[37]
*1366 In crafting the proper remedy for court appointed counsel, we note that the state can expect attorneys to provide services to the public because they have the key to the courthouse when no one else does. The court is their gathering place where they conduct much of their business. And, this stage, provided at the public expense, is the place where attorneys put on their greatest performances.
Just because they have access to our courts, however, does not mean that we can require attorneys to conduct a grand performance at no charge and at the same time burden them with the state's responsibility. The services that attorneys provide are part of their business. In our pecuniary culture we neither can not expect nor force attorneys to work at rates that are confiscatory of their time and talent.
Today we hold that attorneys must be paid reasonable compensation when representing an indigent criminal defendant.[38] In any calculation of reasonable compensation, we emphasize that the calculation should factor in the cost of overhead expenses. Moreover, attorneys will have to be compensated for out-of-pocket expenses that are incurred during the course of his representation of the accused.
We are cognizant of what the federal courts provide for counsel in representing indigent criminal defendants, who have become a part of the federal system. In addition, we are also aware of the flexibility in providing reasonable fees allowed by many other jurisdictions. We can not require counties to pay court appointed counsel the fair market rate for their services because there is a pro bono factor. But see, DeLisio, 740 P.2d at 443. In the alternative, however, we agree with the State and we hold that counsel's hourly rate must be tied to the hourly rate of the district attorney's office. We also hold that there is no maximum number of hours that counsel can represent an accused. Because we know that assistant district attorneys are paid at an hourly rate that is less than the district attorney, we hold that counsel in death penalty cases must be paid at the rate that the district attorney earns.[39]
Because of our constitutional obligation to see that rich and poor alike are represented adequately; because of the inherent power of the court; and because of the serious role that this court plays in criminal prosecutions, we establish these guidelines to take effect immediately. We still invite the Legislature to address our entire indigent defense system. We know that this approach may impact adversely on some counties so therefore, we encourage the Legislature to consider the possibilities of establishing a criminal and/or capital defense fund project and putting more burden on the state instead of individual counties.
However, until changes are made, which address the problems indictated throughout this opinion, these are the official guidelines to determine the proper pay for attorneys appointed to represent indigent defendants. Although we do not establish a ceiling for counsel hourly rate, we do establish a floor. In no case should counsel for inidigent defendants be paid less than $30 per hour.
*1367 At the conclusion of each trial, however, there shall be a hearing. Counsel for defendant can present evidence from numerous sources to establish that he is entitled to be compensated at more than the $30 rate. In the trial court's determination, he must consider the complexity of the case; the experience of counsel involved; the time and labor involved in representing his client, which includes in-court and out-of-court time; the preclusion of other employment by the attorney due to the acceptance (appointment) of the case; the customary fee for similar work in the community; the undesirability of the case, as most capital cases are undesirable; and any other factor the court deems appropriate. See generally, Johnson v. Georgia Highway Express, Inc., 488 F.2d 714-19 (5th Cir.1974) (twelve considerations to determine a reasonable attorneys fees). Accord Carter v. Clegg, 557 So.2d 1187 (1990). The trial judge's determination shall be reviewable, however, when supported by sufficient and adequate findings, this decision only will be subject to this Courts familiar manifest error/abuse of discretion standard.
We reiterate that courts must be allowed to reasonably, appropriately and adequately compensate attorneys just as they do other things "that are absolutely essential to the performance of their judicial function." Makemson, 491 So.2d at 1113. See also, Hosford, 525 So.2d 789. Token compensation is not the answer.[40]

IV.

ONE FINAL POINT
The State attempts to distinguish Pruett's case from Wilson's by asserting that "non-profit" or public interest attorneys should be paid less than "regularly" appointed counsel. Moreover, according to the state, "Pruett's attorneys ... actively sought appointment as his counsel in his retrial ..." Brief of Appellee at 3. Pruett, on the other hand, insists that "Judge Coleman solicited counsel to take responsibility for the trial both because he was having difficulty finding counsel willing to tak on a case as notorious and complex as Pruett's." Reply Brief of Appellant at 1.
To briefly address this first point, we emphasize several things about this case. This was an extremely complex case which aroused the community's outrage. See, Mississippi Publishers, 515 So.2d 1163; see also Pruett v. Thigpen, 444 So.2d at 819. Had Judge Coleman appointed other attorneys, they would have had to familiarize themselves with all the litigation that had transpired in the case before the retrial. They would have had to trace every step already taken by prior counsel. In the end far more money would have been spent in prosecuting this matter. Cf. Murray v. Giarrantano, 492 U.S. 1, ___, 109 S.Ct. 2765, 2771, 106 L.Ed.2d 1, 12 (1989) (plurality opinion) (Sensible for state to concentrate resources in providing attorneys for capital defendants during the trial and appellate stages in capital proceedings. "Capable lawyering there would mean fewer colorable claims of ineffective assistance of counsel to be litigated on collateral view.") Thus, this would have increased the possibility of having ongoing litigation concerning errors made during the course of the trial.
*1368 In a second argument the State asserts that these salaried public interest lawyers, who are not personally paying office expenses, should be paid on a scale which takes this into account. As a matter of fact, according to the State, because this organization is "funded by grants and donations [and] offers free representation to death row defendants" this would militate against their receiving any additional compensation for this case. Brief of Appellee at 3-4.
This argument as presented by the state is devoid of a scintilla of merit. The immediate response to this argument is if these attorneys are not permitted reasonable compensation for these reasons then very few attorneys would be entitled to no more than token compensation. For example, every associate in a law firm receives a salary and none pays overhead expenses. In the event that a corporate attorney is qualified to handle a capital case, then to pay an attorney more just because he/she is part of the corporate structure runs afoul of equal protection and equal justice.
Stated another way, to pay a public interest lawyer less just because he/she has chosen to accept the most unpopular cases says a lot about the state's commitment to assuring that constitutional protections are continued to be of paramount importance in American Democracy. Cf. Stanford Daily v. Zurcher, 64 F.R.D. 680, 681 (N.D.Cal. 1974), aff'd 550 F.2d 464 (9th Cir.), rev'd on other grounds Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) ("The rationale of awarding reasonable attorneys fees ... springs from the need for placing the legal defense of certain constitutional principles ... on an equal footing with the protection of private interests"). In most instances these are the attorneys who provide the best assistance to defendants and therefore, if there is a distinction to be drawn, they should be the ones who are paid more.
In any event public interest lawyers should be paid no less than private attorneys. This fact just recently has been reiterated by the Supreme Court. The Court explained:
"... fee awards [should not] vary depending on whether [the client] was represented by private counsel or by a non-profit legal services organization." That a non-profit legal services organization may ... have agreed not to charge any fee [from the client] ... does not preclude the award of a reasonable fee [by the government] ... calculated in the usual way.
Blanchard v. Bergeron, 489 U.S. 87, 95, 109 S.Ct. 939, 945, 103 L.Ed.2d 67, 76 (1989) (quoting Blum v. Stenson, 465 U.S. 886, 894, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984)).
Reasonable fees should be the yardstick used to determine what compensation is due to an attorney. Courts "must avoid ... decreasing reasonable fees because the attorneys conducted the litigation more as an act of pro bono publico than as an effort at securing a large monetary return". Blum, 465 U.S. at 895, 104 S.Ct. at 1547 (quoting Stanford Daily, 64 F.R.D. at 681). Therefore, the Supreme Court held:
In determining the amount of fees to be awarded, it is not legally relevant that plaintiffs' counsel... are employed by ... a privately funded non-profit public interest law firm. It is in the interest of the public that such law firms be awarded reasonable attorneys' fees to be computed in the traditional manner when its counsel perform legal services otherwise entitling them to the award of attorneys' fees.
Blum, 465 U.S. at 895, 104 S.Ct. at 1547 (quoting Davis v. County of Los Angeles, 8 E.P.D. 5047 (¶ 9444), 5048-59 (C.D.Cal. 1974)). Accord Alberti v. Sheriff of Harris County, 688 F. Supp. 1176, 1190 (S.D. Tex. 1987) order modified, Alberti v. Klevenhagen, 688 F. Supp. 1210, aff'd in part, rev'd in part on other grounds, 903 F.2d 352 (5th Cir.1990) (Reasonable fees are determined by the prevailing market rate; the prevailing market rate is the rate existing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation; prevailing market rate must be the same, irrespective of whether a plaintiff was represented by *1369 private counsel or by a nonprofit legal services organization.) (emphasis added). Any amount that is awarded to Pruett's counsel, even if its determined by market value or reasonableness, cannot be characterized as a "windfall" because:
... [F]ee wards, properly calculated, by definition will represent the reasonable worth of the services rendered ... It is central to the awarding of attorney's fees ... that the district judge, in his or her good judgment, make the assessment of what is a resonable fee under the circumstances of the case.
Blanchard, 489 U.S. at 96, 109 S.Ct. at 946, 103 L.Ed.2d at 77.
Based on the foregoing, it is unquestionable that public interest attorneys should be paid at the same rate that private counsel are paid when they are appointed to represent indigent defendants.[42]

CONCLUSION
In the end, we conclude that the statuory rate of compensation adversely impacts on the courts efficient administration of justice. Because of that infringement and because the Court has the obligation of appointing counsel, we adopt the foregoing method in compensating counsel.
NOTES
[1] See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[1] A capital case is criminal offense and crime punishable by death or life imprisonment in the state penitentiary. See MISS. CODE ANN. § 1-3-4 (Supp. 1990).
[2] The State, however, proposes that there should be a cap on the fees which equalling $25.00 per hour for a maximum of 200 hours.
[3] Woodson specifically states that "the penalty of death is qualitatively different from a sentence of imprisonment however long... . Because of that qualitative difference, there is a corresponding need for reliability in the determination that death is the appropriate punishment in a specific case." Id. 428 U.S. at 305, 96 S.Ct. at 2991 (footnote omitted).
[4] Other courts similarly have expressed the special nature of death penalty proceedings. For example, in his book, a former justice of the Supreme Court of California gave this discussion:

Capital cases, because of their complexity and the high stakes, are enormously costly, both at trial and on appeal; indeed, according to some data, it costs the public more to litigate death penalty cases to execution than it would cost to keep the defendant in prison for life. But the costs are not just monetary; there are costs to the system that cannot be measure in dollars alone. Every lawyer and judge familiar with the field knows that issues of criminal law and criminal procedure tend to be decided differently in the context of a death penalty appeal than otherwise.
Death penalty cases require an enormous amount of judicial attention. The appellant records and the briefs all tend to be exceptionally large, the issues tend to be complex, and once the defendant is executed, mistakes cannot be corrected. Most staff lawyers and judges tend to feel a special sense of responsibility to study the record carefully and to consider issues that may not have been raised by defendant's counsel.
Grodin, In Pursuit of Justice, 100 (1989).
[5] As a matter of fact, the ABA has established these guidelines for appointing counsel for these cases:

A. Minimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for non-capital cases, should not be adopted as sufficient for death penalty cases.
B. Counsel in death penalty cases should be required to perform at the level of an attorney reasonably skilled in the specialized practice of capital representation, zealously committed to the capital case, who had adequate time and resources for preparation.
American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Commentary to Guideline 11.2 (1989).
[6] In fact, some members of this Court accepted this notion of capital cases: "Representation of one charged with a capital crime is one of the most serious  and most unpleasant responsibilities that may be visited upon a member of the bar... . Timid counsel are of no help in this regard." Pruett v. Thigpen, 444 So.2d 819, 834-35 (Miss. 1984) (Robertson, J., specially concurring, joined by Patterson, C.J., Lee Dan and Prather, JJ.), aff'd 805 F.2d 1032 (5th Cir.1986), cert. denied 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d (1987).
[7] In his brief Pruett notes that the $1,000 fee paid to each of the attorneys represented $2.22 per hour for Bright and $2.07 for Singleton. Therefore, they were paid less than the minimum wage. Wilson's counsel likewise were paid less than the minimum wage as Dennis Horn expended 562 hours on the case and Barry Powell spent 779.2 hours.
[8] To prepare for this motion, counsel felt obligated to find an expert and, without having the opportunity to secure advance authorization from Judge Coleman, paid $3,250 to Dr. Melvin A. Gravitz for his expert assistance in preparation and testimony. The trial court later denied counsel's motion for reimbursement for Gravitz' bill. See, Brief of Appellant at 5.
[9] In addition to motions seeking a determination of the admissibility of the prior convictions, counsel applied for funds to bring a witness from Arkansas for pre-trial hearings. For the penalty phase, counsel sought funds for witnesses from North Carolina, as well as from New Mexico, Nevada and Ohio. The investigation necessary to compile this list was far broader. Moreover, counsel also were required to spend several days during the middle of trial investigating an alleged stabbing at the Mississippi State Penitentiary at Parchman. This investigation required interviews with a large number of inmates and personnel at the penitentiary and reviewing volumes of records. See, Brief of Appellant at 5, nn. 6-8.
[10] This fee cap could have been swallowed by a month's lodging in local accommodations for counsel since they were from out-of-state. Add this to the cost for meals and long-distance telephone calls required during the trial then there is very little money left as payment for handling the case. Counsel, however, were gracious enough not to seek reimbursement for these expenses.
[11] Counsel, however, conducted a heroic performance, and they continue to do so. See, Robertson, The Lawyer as Hero, 53 Miss.L.J. 431 (1983).
[12] The record does not reflect how much the experts for the prosecution were paid. On another note, we do know at the time these cases were filed for appeal, MISS. CODE ANN. § 25-3-32 (Supp. 1988) provided that the district attorney's annual salary shall be $30,000 or 90% of the circuit judge's salary. Circuit judges' salary under MISS. CODE ANN. § 25-3-35 was $61,200; therefore, the district attorney's salary equalled $55,080. Today circuit judges' salary is $66,200 see, MISS. CODE ANN. § 25-3-35 (Supp. 1990); therefore, the district attorney's salary is $59,580.00. MISS. CODE ANN. § 25-3-32 (Supp. 1990).
[13] For example, counsel for Wilson conducted at least three trials, and more than fifty motions were filed. The first trial, which lasted eight days, ended in a hung jury. At this trial thirty-seven witnesses testified and ninety-one exhibits were introduced into evidence.

After reindictment, Wilson was convicted in a fifteen-day trial. At this trial sixty witnesses testified. At the conclusion of the guilt phase, a sentencing phase was conducted. The jury was unable to agree upon a sentence; therefore, Wilson was sentenced to life imprisonment. Like Pruett's counsel, Wilson's counsel conducted an heroic performance.
[14] See, Death Penalty Questionnaire Responses of those having conducted Death Penalty case, reproduced in Brief of Amicus Curiae Mississippi Trial Lawyers' Association and Magnolia Bar Association in Support of Petitioner, Wilson v. State, 574 So.2d 1338.
[15] We realize that there are those who believe the judiciary's sole role is to preside over the adjudicative process and that providing manpower for criminal defense is an executive function. See, State v. Lynch, 796 P.2d 1150, 1166 (Okl. 1990) (Opala, V.C.J., concurring in part and dissenting in part). But see majority, Lynch, 796 P.2d at 1162-63; and 796 P.2d at 1174 (Sims, J., Dissenting.) Our responsibility, however, goes beyond adjudicating. Cf. O'Coins, Inc. v. Treasure of the county of Worcester, 362 Mass. 507, 510, 287 N.E.2d 608, 611 (1972) (court's authority is not limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate); see also, State Courts: A Blueprint for the Future, National Center for State Courts 145 (1978) (Judiciary's role is more complex than simply adjudicating disputes. It takes on "executive funcitons" to the extent that judges are involved with the administration of the litigation system and it has some legislative function in the development of the substantive law within the jurisdiction through the decisional process). See generally, Cratsley, Inherent Powers of the Courts, The National Judicial College (1980).
[16] In the dissenting opinion of Bailey, two justices asserted that:

As a matter of public policy the circuit court is vested with inherent power to do any and all things necessary to the end that its processes may be accomplished and that the orderly administration of justice may proceed unfettered and unrestraned. This power includes to require the county to pay the necessary expense of accomplishing its purposes, whether there is a statute specifically authorizing such payments or not. If it was otherwise the legislature could, if it desired, make it impossible for the court to carry out its constitutional mandate.
236 So.2d at 424 (Inzer, J. and Etheridge, C.J., dissenting). Accord Hosford, supra.
[17] In Young, the specific question before the court was whether $150.00 for counsel was so inadequate that it is tantamount to denying due process of law. Id. at 320. Young was a case that involved an armed robbery. The fact that the cases sub judice involve capital crimes allows this court to use a higher scrutiny when addressing this issue; therefore, this Court easily can find that $1,000 is not an adequate/reasonable amount for time and services provided in this case. And, this limit impacts adversely on the effective administration of justice. Moreover, this Court must not be timid in asserting its perogative. In fact, the Supreme Court of Florida faced this same dilemma and concluded:

We are mindful of the potential burden placed on . .. treasuries as a result of the departure from the statutory maximum fee cap. However, since the State .. . enforces the death penalty, its primary obligation is to ensure that indigents are provided competent, effective counsel in capital cases.
White v. Board of County Commissioners, 537 So.2d 1376, 1379 (Fla. 1989). See also Makemson v. Martin County, 491 So.2d 1109, 1113 (Fla. 1986) ("In order to safeguard that individual's rights, it is our duty to firmly and unhesitatingly resolve any conflicts between the treasury and fundamental constitutional rights in favor of the latter."); see also BRIEF OF APPELLEE in Wilson v. State, 574 So.2d 1338 ("[I]f Mississippi's prosecutors are to execute the will of the people and pursue the death penalty ... then the people must be prepared to shoulder responsibly the expense of reasonable attorney compensation"). Cf. Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985) (where rights of the defendant are weighed against financial imposition on the state, "the State's interest in its fisc must yield"); Cunningham v. Superior Court (Ventura County), 177 Cal. App.3d 336, 351, 222 Cal. Rptr. 854, 864 (1986) (constitutional rights are not measured or limited by monetary considerations).
[18] In capital cases, counsel has to prepare for two trials. The issues in the trial are different. In order to prepare for both phases counsel must conduct a detailed investigation. This notion itself has prompted the Florida Supreme Court to refine its rule allowing a waiver of the limitation in capital "cases involving extraordinary circumstances and unusual representation." Makemson, 491 So.2d at 1110. In White v. Board of Commissioners, the court concluded that one would be "hard pressed to find any capital case in which the circumstances would not warrant an award of attorney's fees in excess of the current fee cap [of $3,500]." 537 So.2d at 1378. See also Bias v. State, 568 P.2d 1269, 1270-271, n. 1 (Okla. 1977) ("the expenditure of 255 hours on a murder case clearly is ... burdensome, considering a lawyer has an average of 1,200 billable hours per year."); Jewell, 383 S.E.2d at 547 (where lawyers losing money on cases, "effective immediately no lawyer in West Virginia may be required to devote more than 10 percent of his normal work year to court-appointed cases.") (emphasis in original). Because of the exhaustive investigation and preparation necessary for capital litigation, all capital trials involve "extraordinary and unusual" representation.

Capital trials are not alone in requiring extraordinary and unusual circumstances. Indeed other cases which do not involve capital crimes exhaust just as much time as a capital trial. Because we deem those cases as just as important as captial cases, notwithstanding the heightened scrutiny involved in capital cases, we inform trial judges, the bar and the public that this decision is just as applicable to those cases and criminal cases in general.
Simply put, in order to prevent the remedy from resulting in a stop-gap measure, we hold that the remedy must be extended to all criminal trials.
[19] This Court has explained that:

[p]rior to the adoption of the Constitution of 1890, a citizen was only protected against the taking of his property for public use without due compensation; he had no protection against injuries to his rights ... less than the appropriate of the property itself. The words "or damaged" were inserted in the section of the Constitution ... in order to remedy this wrong, and it was the manifest purpose of the framers of the Constitution to protect the citizen in the use and enjoyment of his property, and to guarantee him those damages which were not embraced within the actual taking of property.
Parker v. State Highway Commission, 173 Miss. 213, 215, 162 So. 162, 163 (1935) (emphasis added).
[20] One court has noted that the impact of Dillon is clear. Mississippi and Alaska are two of several states that simply have quoted this language from Dillon without discussion. See, State ex rel. Scott v. Roper, 688 S.W.2d 757, 762, n. 7 (Mo. 1985).

But, while some courts hold onto Dillon, "[a] substantial minority of courts take the position that an attorney may not be appointed to render gratuitous service." * * * Moreover, "the majority of commentators also appear to reject the reasoning in [Dillon]." Id. at 764 (citations and footnote omitted).
[21] We reiterate that this duty rests with the court and not the executive or legislative branches. In Powell v. Alabama, the Supreme Court provided the following discussion:

[W]here the defendant is unable to employ counsel . .. it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law ... * * *
The duty of the trial court to appoint counsel under such circumstances is clear, as it is clear under circumstances such as are disclosed by the record here; and its power to do so, even in the absence of a statute, can not be questioned. Attorneys are officers of the court, and are bound to render service when required by such an appointment....
The United States by statute and every state in the Union by express provision of law, or by the determination of its courts, make it the duty of the trial judge, where the accused is unable to employ counsel, to appoint counsel for him.
287 U.S. 45, 71, 73, 53 S.Ct. 55, 65, 65, 77 L.Ed. 158, 171, 172 (1932) (emphasis added).
[22] One prosecutor has defined the State's interests as follows:

First, given the serious consequences ... a defendant deserves to have decent counsel who can devote time, energy, experience and requisite skill to his client's cause. Second, from the standpoint of the prosecutor, it is generally preferable to have quality opposition than to have a bumbler. Quality opposition means that we can worry about our case  and not so much about whether all the issues have been raised by the defense." Van de Kamp, The Right to Counsel: Constitutional Imperatives in Criminal Cases, 19 Loyola of L.A.L.Rev. 329, ___ (1985).
[23] As has been noted in an analagous context, "[t]olerating a system in which perhaps one innocent man in a hundred is erroneously convicted despite each jury's attempt to make as few mistakes as possible is ... vastly different from instructing a jury to aim at a 1% rate of mistaken convictions." Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329, 1374 n. 143 (1971) (emphasis in original). Similarly, it is one thing to say that this Court will correct a failure in the process, where counsel's performance is indeed deficient; it is quite another to say that the system should be designed to encourage deficient performance.
[24] We, equally are concerned with the effective representation of all criminal defendants.
[25] Various attorneys with experience in capital cases echoed a similar view. Merrida Coxwell and Percy Stanfield simply cannot "afford to accept appointment to any more capital murder cases." Dennis Sweet does not feel he can take on another case, "[b]ased on the economics of the situation." Wilson v. State, 574 So.2d 1338, Vol. ___, T. ___.

On a similar note, one contract public defender stated that she got 153 cases in three months, and she refused to take any more. Her contract required her to handle anything that came through the door. Her salary was approximately $24,000.00. She was "offered the chance to resign[, and she] took it." See, Coyle, Strasser & Lavelle, Fatal Defense, National Law Journal at 333, June 11, 1990.
[26] When this happens, the obvious occurs: lawyers can never achieve the level of experience required in this "highly specialized [area ... where] few attorneys have `even a surface familiarity with the seemingly innumerable refinements... .'" Irving v. State, 441 So.2d at 856.
[27] A recent study of six southern states focused on this very issue. One of the key findings concluded that:

Wholly unrealistic statutory fee limits on defense representation  such as Mississippi's flat unwaivable $1,000 cap, equivalent to a fee of about $5 per hour for many lawyers  act as disincentive to thorough trial investigation and preparation.
See, Coyle, Strasser & Lavelle, Fatal Defense, The National Law Journal, June 11, 1990 p. 30. See also Note, Uncompensated Appointments of Attorneys for Indigent Criminal Defense: The Need for Supreme Court Standards, 14 S.W.U.L. Rev. 389, 398 (1984) ("studies and current cases support the correlation between the amount of money that is expended for defense services and the resulting quality of representation received."); Rural Justice at the Crossroads, 4 Calif.L.Rev. 22, 25 (1984) ("modest hourly rates tend to attract well-intentioned but often inexperienced lawyers"); Defenders Underpaid, ABA report says, 67 A.B.A.J. 1107 (Sept. 1981) (undercompensation means that "private attorneys often are unwilling to accept appointments or don't put forth every effort for their clients."); Feldman, But who will pay the Attorney?. 22 Judges J. 1, 19 (Winter 1983) (undercompensation of attorneys creates "stopwatch justice.").
[28] All capital cases are unusual or extraordinary. See, White, 537 So.2d at 1380. "Capital trials confront defense attorneys with a unique separate sentencing phase and obligate them to master appellate doctrine that limits review of trial errors as well as anticipate new capital law percolating in courts around the country." Coyle, Strasser & Lavelle, Fatal Defense at 31. See also, supra, pp. 1346-1348.
[29] This argument is deflated when this record is examined. Pruett received equal justice. His attorneys performed excellently, as if they were retained with top dollars.
[30] Wilby v. State, 93 Miss. 767, 777, 47 So. 465, 466 (1908).
[31] For example, Pruett's counsel, who were paid $1,000 each, paid one of their experts $3,250. Other out-of-pocket expenses included housing accomodations, food and long distance telephone calls.
[32] This is in accord with the Mississippi Rules of Professional Conduct which recognize that lawyers are permitted to withdraw from representing a client if "the representation will result in an unreasonable financial burder on th lawyer ..." Rule 1.16(b)(5); accord. ABA Guidelines in Death Penalty Cases, commentary to Guideline 10.1 (Low fees make it economically unattractive for competent attorneys to seek assignments and to expend the time and effort a case may require); see also, supra, at 1359-1361.
[33] We are constitutionally obligated to "administer justice without respect to persons, and do equal right to the poor and to the rich." MISS. CONST. Art. 6 § 155 (1890).
[34] In another section of its brief, the Attorney General reiterates that the Legislature has "already declined in its most recent session to proffer a remedy of its own volition, [therefore] it is apparent that this Court may seek amelioration upon its own inherent authority." Brief of Appellee at 52-3.
[35] The trial court in each instance found that these hours were reasonable in representing the two defendants.
[36] See, White, 537 So.2d 1376 (Fla. 1989).
[37] The commentary to that guideline provides that flexible standards for compensation must be created. These standards should take into consideration

the number of hours expended plus the effort, efficiency and skill of capital counsel. Among the criteria might be the role and experience of the attorney; less experienced co-counsel might be compensated at a lower rate than lead defense attorneys ... Flat payment rates or arbitrary ceiling should be discouraged since they impact adversely upon vigorous defense. Rather assigned counsel should be provided a rate of hourly compensation which reflects the extraordinary responsibilities and commitment required of counsel in death penalty cases.
[38] We note that there are those who believe that the statute allows for flexibility because it provides that counsel shall be reimbursed for actual expenses although his compensation for services shall not exceed $1,000. Therefore, his compensation may exceed $1,000 as a necessary expense of the litigation. See, Morris, Mississippi's Challenge, 9 M.C.L.Rev. at ___.

We, however, believe that the approach presented today will avoid confusion in the future and it will negate endless litigation on a case by case basis.
[39] In non-capital cases, however, counsel can be paid at a lesser rate. Realizing that some non-capital cases are as complex or even more so, upon sufficient showing of the complexity of the issues involved, the experience of counsel, and the time involved, the trial court can determine that counsel should be paid at the rate greater than assitant district attorneys but no more than the district attorney. In no event should counsel be paid at a rate less than the assistant district attorney in that district with the lowest salary.
[40] In the long run, this Court can save thousands of dollars for the State by reasonably compensating counsel and in investing in effective counsel. "There is a direct and positive impact in states that invest in special training for capital defense lawyers: fewer constitutional flaws... ." Coyle, Strasser & Lavelle, Fatal Defense, National Law Journal 41 June 11, 1990. Skilled counsel will not only be able to bargain for and win on a lesser charge. Moreover, because the state has invested in skilled counsel, there may still be appeals, but "fewer cases will come back to be retried because of errors; retrial is very expensive." Statement of Robert Spagenburg, nationally known expert on indigent defense, quoted in Fatal Defense, supra, at 41.

As a matter of course, new decisions are generally applicable only to those cases not yet final. "By `final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." Griffith v. Kentucky, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987). We adopt this approach today and those petitioners who have raised the issue in court will get the benefit of this rule.
[42] One should remember that this is now a dissenting opinion.